2026 IL App (2d) 240386-U
No. 2-24-0386
Order filed August 4, 2026

**NOTICE:** This order was filed under Illinois Supreme Court Rule 23(b) and is not precedential except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, | ) | Appeal from the Circuit Court of Lake County. |
| v. | ) | |
| MICHAEL D. COFFEE, Defendant-Appellant. | ) | Honorable Victoria A. Rossetti, Judge, Presiding. No. 13-CF-1610 |

JUSTICE BIRKETT delivered the judgment of the court.
Justices Hutchinson and Jorgensen concurred in the judgment.

**ORDER**

¶ 1   *Held*: Defendant's 40-year sentence, imposed after he pleaded guilty to first-degree murder committed when he was 17 years old, is affirmed where: (1) defendant was not denied a fair sentencing hearing, (2) the circuit court did not abuse its discretion in imposing sentence, and (3) defense counsel strictly complied with Illinois Supreme Court Rule 604(d).

¶ 2   Defendant, Michael D. Coffee, pleaded guilty under an accountability theory to one count of first-degree murder in connection with the June 2013 shooting death of 20-year-old Colin Nutter. There was no agreement as to sentencing. The charges arose from the conduct of defendant, who was 17 years old at the time of the offense, and codefendants Phillip Vatamaniuc and Benjamin M. Schenk, who were 17 and 20 years old, respectively. On March 5, 2024, following a sentencing hearing, the circuit court sentenced defendant to a term of 40 years'

imprisonment and 3 years' mandatory supervised release. Defendant appeals, arguing that (1) the court relied on unsupported or contradicted information regarding his role in the offense and improperly relied on biased statements in the presentence investigation report (PSI); (2) the court abused its discretion in imposing sentence where his conduct was greatly influenced by his youth and developmental delays, the record did not support a finding of permanent incorrigibility, and youthful-offender parole did not meaningfully mitigate the severity of the sentence; and (3) defense counsel failed to strictly comply with Illinois Supreme Court Rule 604(d) (eff. Oct. 19, 2023). Defendant prays that we vacate his 40-year sentence and either reduce his sentence to 20 years or remand for a new sentencing hearing before a different judge. Alternatively, defendant prays that we vacate the denial of his postplea motions and remand for new postplea proceedings before a different judge. We affirm.

¶ 3                     I. BACKGROUND

¶ 4     Defendant, along with codefendants Vatamaniuc and Schenk, were indicted by a grand jury on multiple counts, including first-degree murder, armed robbery, unlawful possession of a stolen motor vehicle, and concealment of a homicidal death, arising from the June 3, 2013, shooting death of Colin Nutter.

¶ 5     During the pendency of the case, defendant was repeatedly found unfit to stand trial and later restored to fitness. Specifically, he was found unfit in August 2016, July 2018, and October 2020, but was restored to fitness between those findings, with the final restoration to fitness occurring in December 2020.

¶ 6     On June 14, 2023, defendant and his counsel appeared before the circuit court and requested a conference pursuant to Illinois Supreme Court Rule 402 (eff. July 1, 2012). The court explained to defendant what a Rule 402 conference entailed and advised defendant that the

decision to proceed with the conference was his alone. Defendant confirmed that he wished to proceed. Later that afternoon, the court conducted an off-the-record conference in chambers with the State and defendant's counsel.

¶ 7       On July 19, 2023, at the next court appearance, the circuit court advised defendant of what had transpired at the Rule 402 conference, including its understanding of the facts of the case. Pertinently, the court informed defendant of its understanding that the firearm used in the offense had been stolen during a house party attended by all three codefendants, and that defendant "had the gun in [his] waistband." The court further indicated its understanding that all three co-defendants were at Lauren Hahn's house before the murder and that defendant "had the gun and pulled it out and the gun was being passed around." It further advised that defendant was seated in the front passenger seat when Nutter was shot, and that defendant was "part of the group when the body of the victim was dumped on the side of the road; that you came back and got out and threw the body and went back to get the wallet, although it was Schenk and Vatamaniuc who actually got out of the car to get the wallet, not [defendant]." Finally, the court stated its understanding that all three codefendants were "involved in cleaning the victim's car" and thereafter entered Nutter's residence and stole a family vehicle. The court indicated that the Rule 402 conference included discussion of "an open plea and a sentencing hearing." Defendant confirmed that his counsel accurately informed him as to what had transpired at the conference.

¶ 8       On December 11, 2023, defendant pleaded guilty via an open plea to one count of first-degree murder, and, in exchange, the State agreed to dismiss the other charges upon sentencing. The court confirmed defendant's understanding that there was "absolutely no agreement" as to what his sentence would be, and it admonished defendant that the sentencing range for that offense was 20 to 60 years' imprisonment to be served at 100%, followed by 3 years of mandatory

supervised release. The court also noted that, during two prior Rule 402 conferences, it had indicated that, if defendant pleaded guilty to first-degree murder, "the sentence could be somewhere between 35 and 42 years in the Illinois Department of Corrections." Defendant indicated that he understood each admonition and that he was entering his plea voluntarily, without threats or promises beyond those stated in open court.

¶ 9    The State provided the following factual basis in support of defendant's plea, to which defendant stipulated. Prior to the murder, while defendant, Schenk, and Vatamaniuc were at her Highwood home, Hahn observed each of them handling a semiautomatic handgun, loading and unloading the firearm's magazine. Defendant, Schenk, and Vatamaniuc arranged to meet Nutter under the pretense of purchasing marijuana from him but intending to rob him. Security video from an elementary school across the street from Hahn's home captured the three individuals leaving the residence on foot and walking in the direction of the murder scene.

¶ 10    The group met Nutter at a prearranged location and entered his Dodge Stratus. Nutter sat in the driver's seat, Coffee sat in the front passenger seat, and Schenk and Vatamaniuc sat in the rear seats. During the encounter, either Schenk or Vatamaniuc shot Nutter in the back of the head.

¶ 11    Schenk and Vatamaniuc placed Nutter's body in the trunk and drove the Dodge Stratus to Hahn's house. Security video from the school across the street captured the Stratus arriving at Hahn's home, where they obtained cleaning supplies and used them to clean the interior of the vehicle. The group later drove the vehicle to another residence, where they washed out the trunk and obtained shovels whilst wearing gloves. A witness at that residence observed blood, feet, and "legs up to the mid shin," inside the trunk. The group then drove Nutter's body to Wilmette, where they left it near a frontage road running parallel to the Edens Expressway. They covered it with leaves and sticks. The group later returned to the area where they left the body and took Nutter's

wallet. Thereafter, they smoked the marijuana they had stolen from Nutter. A woman walking her dog discovered Nutter's body that same night and called the police. Police found no wallet or other identification on or near the body but, through fingerprint analysis, later identified the victim as Nutter.

¶ 12    Early the next morning, defendant and Schenk went to Nutter's home, where he lived with his parents, and stole several items, including marijuana from his bedroom, medication for the family dog from the kitchen counter, and a Ford Focus from the garage. Along with Vatamaniuc, they later drove the Dodge Stratus to Chicago while the Nutter family's Ford Focus followed behind. They abandoned the Stratus in Chicago and returned to Highland Park in the Focus. Surveillance video captured the group leaving the Stratus in Chicago and departing in the Focus.

¶ 13    Defendant and Vatamaniuc later visited another witness at his home. Vatamaniuc stated that they had killed Nutter, and defendant shouted, "Bang!" They also discussed how they placed Nutter's body into the trunk of his vehicle and disposed of the body near a road.

¶ 14    On June 5, 2013, police located Nutter's vehicle in Chicago and discovered blood in the trunk. They also located the family's Ford Focus in Hahn's driveway. Officers surveilled the Focus and observed Schenk attempting to gain entry to it. Schenk was arrested and, based on information he provided to investigators, Vatamaniuc and defendant were subsequently arrested. During the investigation, police recovered from Hahn's garbage can a blood-covered trunk liner taken from Nutter's vehicle and medication bottles for the Nutter family's dog. Police also recovered a loaded .40 caliber semiautomatic handgun bearing a "FNH" marking in the backyard of the residence where Schenk had been living.

¶ 15    The State further proffered that, in the days leading up to the offense, several witnesses observed defendant with a firearm. Specifically, a witness would testify that, on June 1, 2013, two

days before the murder, defendant and Vatamaniuc visited the witness's home, where defendant removed a .40 caliber semiautomatic handgun and several magazines from his backpack and fired three shots into the ceiling. Additionally, two witnesses would testify that, on June 2, 2013, the day before the murder, defendant, accompanied by Schenk and Vatamaniuc, stated that the group had "heat" and displayed a firearm concealed in his waistband bearing the letters "FNH." Police subsequently retrieved three fired projectiles and casings from the June 1 incident, and forensic analysis determined that the firearm recovered from Schenk's residence was the same weapon used to fire the shots into the ceiling and to kill Nutter.

¶ 16    After reviewing the State's factual basis and questioning defendant about the potential sentence and the rights he was surrendering by entering a guilty plea, the circuit court accepted defendant's plea, found that both the plea and the waiver of trial were made knowingly and voluntarily, ordered the preparation of a PSI, and set the matter for a sentencing hearing.

¶ 17    On March 5, 2024, the circuit court held a sentencing hearing. Sergeant Gil Levy, a 22-year veteran of the Evanston Police Department and member of the North Regional Major Crimes Task Force, testified consistently with the stipulated factual basis and added that, after the group entered Nutter's vehicle, and "[a]fter some conversation, [defendant] turned the volume on the radio up, and Mr. Nutter was shot in the back of the head from the back seat." Levy also described the body being moved to the trunk, the location where the group left the body, the group's return to take Nutter's wallet, and the subsequent burglary of the Nutter home. Levy noted that it was Schenk and Vatamaniuc who removed Nutter's body from the trunk and placed it next to a frontage road. Moreover, Levy discussed how defendant and Vatamaniuc later told a witness that they had killed Nutter and that defendant "loudly said the word 'Bang.' " In addition, Levy discussed some of the evidence recovered by investigators, including the blood-soaked trunk liner recovered from

Hahn's garbage can and the projectiles recovered from both the Nutter murder and the June 1 ceiling incident, which ballistics testing linked to the firearm recovered from Schenk's backyard. He further testified that he personally took Vatamaniuc's statement and, other than the identity of the shooter, all three codefendants "essentially [gave] statements that mirrored one another."

¶ 18    Nutter's parents, Michael and Angie, read victim impact statements aloud at the hearing. Nutter's sister, Sara, submitted a written victim impact statement.

¶ 19    In mitigation, defendant submitted a 35-page mitigation psychological evaluation prepared by Dr. Tetyana Kostyshyna, detailing defendant's educational, developmental, and psychological history, as well as a report prepared by a licensed social worker at the Lake County Public Defender's office.  Defendant's aunt, Candace Brown, testified regarding defendant's close family ties and his difficulties in school, which she attributed to his inability to learn as quickly as the other students.  A letter from defendant's brother, Frank Jordan, was read aloud to the court, in which he described defendant as hardworking, genuine, and the epitome of excellence.

¶ 20    Additionally, defendant made a statement in allocution.  He apologized to the Nutter family, stating he regretted not only "what happened that day," but also "not paying attention to what was going on" around him.  He continued that, had he paid attention, he believed that Nutter would still be alive.  Defendant further stated that he "never had any intentions to see anyone get hurt" and requested that the court impose a sentence in the "thirties" so that he could "have some life outside of these jail walls."

¶ 21    In closing argument, the State characterized defendant's guilty plea as "an act of contrition" that warranted consideration by the court, while emphasizing that the plea did not "undo the devastation [caused by] this crime."  The State requested "a minimum sentence in the mid 40s," asserting that such a sentence would provide the community and the Nutter family with a measure

of closure. Defense counsel, in turn, highlighted defendant's chronic academic difficulties in school, low intelligence, frequent findings of unfitness, and Dr. Kostyshyna's findings as outlined in the mitigation report. Counsel emphasized that, although defendant was not the shooter, he was nevertheless accountable for the murder, had pleaded guilty, and had accepted responsibility for "his part in this deadly act," with "no trial, no deal, [and] no reservation." Counsel further noted that defendant had "pleaded guilty with only the hope of leniency from this Court," and that counsel had "gone over with him repeatedly and slowly all of this." Counsel requested that the court "impose a sentence in the 20s."

¶ 22 The circuit court sentenced defendant to 40 years' imprisonment, with credit for 3,928 days served, followed by three years of mandatory supervised release. In pronouncing sentence, the court emphasized that it had considered numerous factors, including the statutory factors applicable to offenders who are under 18 years of age at the time of the offense, the statutory factors in aggravation and mitigation, the PSI, the fitness evaluations, defendant's statement in allocution, and the testimony and evidence presented at the sentencing hearing. The court also noted a recent change to Illinois law providing for parole review for offenders under the age of 21 at the time of the commission of an offense. The court commented:

"[j]ust recently on January 1st of 2024, in Illinois, in 730 ILCS 5/5-4.5-115, parole review, persons under the age of 21 at the time of the commission of an offense, subparagraph (b) now states a person under 21 years of age at the time of the commission of first degree murder who is sentenced on or after June 1st 2019 shall be eligible for parole after serving 20 or more years of his sentence, which substantially changes the law.

At the time of the murder of Colin Nutter, you were 17 years of age. And so this Court will go over the *Miller* factors and will follow that process as mandated. However,

I do not believe any sentence I give here today is tantamount to a life sentence because the legislature has now changed that because you are now and will be eligible for parole after 20 years."

The court then detailed its application of the codified *Miller* factors. In discussing the circumstances of the offense and defendant's degree of participation and specific role in the offense, the court commented:

"[Y]ou were part of the planning; you were part of stealing the gun; you called Colin Nutter to set this up; you walked to meet him, knowing that there was a gun; you yelled "do it;" you put Colin Nutter's body in the trunk; you drove around; you went back to the house, stole the car and the pot, back to get his wallet after dumping his body. You were part of it."

The court further commented that defendant's role in the offense reflected "a complete disregard for Colin's life." It continued that, "no matter what the mitigation report indicates," defendant "continue[d] to be disruptive and disregarding human life," which the court characterized as the "mark of a dangerous, incorrigible and irreparably corrupt person."

¶ 23 On April 3, 2024, defendant filed a motion to withdraw his guilty plea and a motion to reconsider sentence. In his motion to withdraw guilty plea, defendant asserted that he did not enter the plea knowingly, voluntarily, or intelligently because he "did not know what was going on" and believed that, upon sentencing, he could "decide if [he] was going to take it" and that, if he rejected the "offer," his case would proceed to trial.

¶ 24 In his motion to reconsider sentence, defendant alleged that the circuit court placed undue reliance on section 5-4.5-115(b) of the Unified Code of Corrections (Code) (730 ILCS 5/5-4.5-115(b) (West 2024)) which, at the time of sentencing, had recently created parole-review eligibility

for certain youthful offenders after 20 years of incarceration. Specifically, defendant argued that the court improperly concluded that, because of the new statute, no sentence it could impose would be "tantamount to a life sentence." Defendant asserted that relief under the Code was speculative and wholly dependent on the discretion of the Illinois Prisoner Review Board, and that, if such relief were denied, he would have no meaningful avenue for review other than waiting 10 years to reapply for parole, which would constitute his final opportunity for early release. In defendant's view, the court "vastly overstate[d] [his] likelihood of success before the [Prisoner Review Board]." Defendant also asserted that the court erroneously attributed certain aspects of the murder to him without support in the record or despite evidence affirmatively refuting the court's characterization of his role in the offense.

¶ 25 On June 26, 2024, defense counsel filed a certificate pursuant to Rule 604(d) stating that he (1) consulted with defendant in person, by mail, by phone, or by electronic means to ascertain his contentions of error in the entry of his guilty plea and sentence; (2) examined the record and report of proceedings concerning his guilty plea and the sentencing hearing; and (3) made any amendments necessary to defendant's motions for an adequate presentation of any defects in those proceedings. Then, at the July 1, 2024, hearing on defendant's motions, defense counsel elected to stand on the written motions and presented no testimony, affidavits, or additional exhibits. The State likewise stood on its previous arguments and the existing record.

¶ 26 The circuit court denied both motions. Regarding defendant's motion to withdraw his guilty plea, the court stated that it had carefully reviewed the December 11, 2023, transcript of the plea proceedings and concluded that defendant had been properly admonished under Rule 402. The court noted that defendant had been advised that there was no agreement as to sentencing, that any sentence imposed would be served at 100%, and that the statutory sentencing range for first-

degree murder was 20 to 60 years' imprisonment. The court further observed that it had referenced during prior Rule 402 conferences, and reiterated at the plea hearing, that the anticipated sentencing range upon a plea of guilty in defendant's case was "between 35 and 42 years." The court also emphasized that defendant confirmed his understanding of these parameters at the plea hearing, stated that he was entering the plea freely and voluntarily, indicated that he had no questions, and denied taking any medication that could affect his understanding of the proceedings. In explaining its denial of defendant's motion to reconsider sentence, the court stated that it would "stand on the ruling that it made *** with regard to the factors—the *Miller* factors because of [defendant's] age."

¶ 27    Defendant timely filed a notice of appeal.

¶ 28                                        II. ANALYSIS

¶ 29    Defendant raises three principal claims on appeal. He contends that (1) he was denied a fair sentencing hearing where the circuit court relied on unsupported or contradicted information regarding his role in the offense and relied on biased statements in the PSI; (2) the court abused its discretion in imposing sentence where defendant's conduct was greatly influenced by his youth and developmental delays, the record did not support a finding of permanent incorrigibility; and the youthful parole statute did not meaningfully mitigate the severity of the sentence; and (3) defense counsel failed to strictly comply with Rule 604(d) where the record refutes that he made the necessary amendments to defendant's motion to withdraw guilty plea for an adequate presentation of any defects in the plea proceedings. We address each argument in turn.

¶ 30                               A. Fair Sentencing Hearing

¶ 31    Defendant first contends that he was denied a fair sentencing hearing because the circuit court considered improper factors and information at sentencing. His argument in this respect is

- 11 -

threefold.  First, he contends that the court relied on aggravating factors related to his role in the offense that were either unsupported by the record or directly contradicted by it.  Second, he argues that the court improperly relied on biased statements and unsupported commentary contained in the PSI.  Third, defendant asserts that, even if neither of these alleged errors independently denied him a fair sentencing hearing, their cumulative effect did.

¶ 32     It is well established that "a defendant has a right not to be sentenced based upon improper factors in aggravation, and a trial judge's reliance upon an improper factor in sentencing impinges upon a defendant's 'fundamental right to liberty.' "  *People v. Whitney*, 297 Ill. App. 3d 965, 969 (1988) (quoting *People v. Martin*, 119 Ill. 2d 453, 458 (1988); *People v. James*, 255 Ill. App. 3d 516, 531 (1993)).  A sentence based on improper aggravating factors will not be affirmed unless the record demonstrates that the weight placed on the improperly considered factor was so insignificant that it did not lead to a greater sentence.  *People v. Heider*, 231 Ill. 2d 1, 21 (2008).  Moreover, "[t]here is a strong presumption that the trial court based its sentencing determination on proper legal reasoning, and a court of review should consider the record as a whole, rather than focusing on a few words or statements by the trial court."  *People v. Canizalez-Cardena*, 2012 IL App (4th) 110720, ¶ 22.  The burden lies with the defendant to demonstrate that his sentence was based on improper considerations or is otherwise improper.  *People v. Conley*, 118 Ill. App. 3d 122, 133 (1983).  While sentences are typically reviewed for an abuse of discretion, the question of whether the circuit court relied on an improper factor in imposing a sentence presents a question of law that we review *de novo*.  *People v. Solis*, 2019 IL App (4th) 170084, ¶ 26; *People v. Bowen*, 2015 IL App (1st) 132046, ¶ 49.  Accordingly, we begin our analysis by determining whether the court relied on an improper factor in imposing defendant's sentence.

¶ 33          1. *Circuit Court's Consideration of Defendant's Role in the Offense*

¶ 34    On appeal, defendant first argues that he was denied a fair sentencing hearing because the circuit court relied in aggravation on information concerning his role in the offense that was either unsupported by, or in some cases directly rebutted by, the record—most notably, that he ordered the shooting by turning up the radio volume in Nutter's car and yelling "do it" immediately before either Schenk or Vatamaniuc shot Nutter. Defendant contends that "no evidence was ever presented that [he] ever said 'do it' or ordered the shooting in any way."

¶ 35    Defendant further maintains that, although he pleaded guilty to first-degree murder and admitted to being "present for the murder," the court erroneously attributed several acts associated with the offense directly to him that the record either did not support or affirmatively attributed to Schenk and Vatamaniuc. According to defendant, those acts included personally stealing the firearm from a friend's house that was later used in the offense, personally calling and arranging to meet Nutter, possessing the firearm as the group walked to meet Nutter, placing Nutter's body in the trunk, abandoning the body along a roadside, and stealing Nutter's wallet after the group returned to the area where they had left Nutter's body. Defendant emphasizes that it was undisputed that he was not the triggerman and that Schenk and Vatamaniuc—not defendant, removed Nutter's body from the driver's seat and placed it in the trunk; later removed it from the trunk, left it on the side of the road, and covered it with leaves and sticks; and stole Nutter's wallet after returning to the location where they had left the body. Defendant emphasizes that, when the group returned to the area where they had left Nutter's body, he "did not get out of the car."

¶ 36    We first address defendant's challenge to the circuit court's consideration of the "do it" allegation before turning to his remaining claims regarding the attribution of specific acts to him.

It is well settled that trial courts are empowered to consider any reliable and relevant evidence when fashioning an appropriate sentence. *People v. Rose*, 384 Ill. App. 3d 937, 941 (2008). The ordinary rules of evidence are relaxed at sentencing hearings because the defendant's guilt has already been established, and all that remains is for the court to determine "the type and extent of punishment, within certain statutory and constitutional limits." *Id*. at 940. Thus, "[t]he source and type of information that the sentencing court may consider is virtually without bounds." *Id*. at 941.

¶ 37 Here, the court's reference to defendant yelling "do it" immediately before Nutter was murdered was neither conjecture nor judicial speculation. As the State notes, the allegation appeared in the 35-page mitigation psychological evaluation prepared by Dr. Kostyshyna, which defendant himself submitted for the court's consideration. In the report, Dr. Kostyshyna outlined her review of the factual circumstances surrounding the offense as developed through case reports prepared by the North Regional Major Crimes Task Force, various police reports, clinical interviews with defendant, court records, and other related materials that she reviewed in connection with the evaluation. Dr. Kostyshyna noted that, in an unrelated case, "C.G.," who was acquainted with defendant, testified that defendant showed him a black gun prior to June 3, 2013. She further noted that C.G. testified in his own case that Schenk described to him the circumstances of the offense while they were housed together in the Lake County jail, including defendant's alleged role in the shooting. Pertinently, C.G. testified that Schenk told him defendant put Nutter's vehicle in park, turned the volume up on the radio, and yelled "do it" immediately before Nutter was shot. Thus, contrary to defendant's contention, the allegation that he shouted "do it" immediately before Nutter was shot was supported by information appearing in the sentencing record. Having personally placed this information before the court, defendant necessarily conceded that its contents were at least relevant, and he cannot now be heard to complain that the

- 14 -

court erred by considering its contents. Additionally, Sergeant Levy testified at the sentencing hearing that after "some conversation" in Nutter's vehicle, defendant "turned the volume on the radio up, and Mr. Nutter was shot in the back of the head from the back seat." This testimony was neither objected to nor challenged through cross-examination, and the court was therefore entitled to rely on it in fashioning an appropriate sentence.

¶ 38    In his reply brief, defendant acknowledges that his mitigation report contained the "do it" allegation, but he emphasizes that this assertion did not arise from the stipulated factual basis supporting his guilty plea but instead appeared in the mitigation report's discussion of the case history and did not constitute an admission. He analogizes the allegation to the "summary of the offense" section of a PSI that, like all sentencing materials, the judge is obligated to "insure [*sic*] the accuracy of information considered and to shield itself from what might be the prejudicial effect of improper materials." *People v. Williams*, 149 Ill. 2d 467, 490 (1992).

¶ 39    Defendant overlooks that the rules of evidence are relaxed at sentencing hearings to allow for a broad and comprehensive inquiry into the defendant's character, the circumstances of the offense, and the defendant's potential for rehabilitation. *People v. Armstrong*, 183 Ill. 2d 130, 154 (1998). See also *Williams*, 149 Ill. 2d at 490 ("the rules of evidence that govern the guilt or innocence phase of a trial are not applicable at sentencing," but rather, "a sentencing judge is given broad discretionary power to consider various sources and types of information so that he can make a sentencing determination within the parameters outlined by the legislature"). Contrary to defendant's argument, it is of no consequence that the mitigation report does not constitute a judicial admission of every factual assertion detailed in it regarding the offense. Evidence is admissible at a sentencing hearing if the proffered evidence is relevant and reliable. *Id*. This means that hearsay evidence, which would ordinarily be inadmissible at trial, is often properly

admitted at sentencing. See *People v. Williams*, 181 Ill. 2d 297, 331 (1998) (observing that "hearsay testimony is not *per se* inadmissible at a sentencing hearing as unreliable or as denying a defendant's right to confront accusers. The objection goes to the weight of the evidence and not its admissibility"). The sentencing court "may search anywhere within reasonable bounds for facts which may serve to aggravate or mitigate the offense." *People v. Reed*, 376 Ill. App. 3d 121, 128 (2007). See also *People v. Foster*, 119 Ill. 2d 69, 96 (1987) ("The only requirement for admission is that the evidence be reliable and relevant [citations], as determined by the trial court within its sound discretion").

¶ 40    Here, the assertion that defendant shouted "do it" immediately before Nutter was shot was sufficiently reliable for the court to consider it during sentencing proceedings because it was contained in the mitigation report that defendant himself submitted to the court for its consideration. Moreover, the instant matter was presided over by the same judge who presided over Vatamaniuc's bench trial, where testimony concerning the "do it" statement was presented under oath. We may take judicial notice of our own records. *People v. Eubanks*, 283 Ill. App. 3d 12, 24 (1996). See also *People v. Torres*, 2019 IL App (1st) 151276, ¶ 36 (observing the appellate court may take judicial notice of court records from related cases). In affirming Vatamaniuc's conviction for first-degree murder, we recounted Schenk's testimony at length, noting that "[m]usic was playing in Nutter's car," Coffee turned up the volume, yelled "do it!" and Vatamaniuc shot Nutter. *People v. Vatamaniuc*, 2021 IL App (2d) 180379, ¶ 47. See also *People v. Vatamaniuc*, 2023 IL App (2d) 210665-U, ¶ 8 (noting that Schenk testified Coffee turned the volume up on the radio and yelled "do it," at which point Vatamaniuc shot Nutter). Although such direct testimony was not presented in the instant matter, it was given under oath in a related judicial proceeding, heard and credited by the same trial judge that presided over the instant case, and was later

memorialized in a published appellate opinion, providing ample indicia of reliability. Under these circumstances, the assertion that defendant shouted "do it" immediately before Nutter was killed was both relevant and reliable, and the sentencing court was therefore entitled to consider it in fashioning an appropriate sentence.

¶ 41 We next consider the remaining specific acts that defendant asserts the circuit court improperly attributed to him. In defendant's view, he neither stipulated that he committed these specific acts nor does the record support a finding that he committed them. In particular, defendant challenges the court's findings that he stole the firearm used in the offense, called Nutter to arrange the meeting, carried the firearm as the group walked to the location where they would shoot Nutter, removed the body from the front seat and placed it in the trunk, abandoned the body and covered it with leaves and sticks, and stole Nutter's wallet after the group returned to where they had left the body. Defendant characterizes these statements as "erroneous and unsupported factual attributions" which the court improperly relied upon in imposing sentence.

¶ 42 Defendant's argument fails because it construes the circuit court's remarks far too narrowly and overlooks the context in which they were made. Section 5-2(c) of the Criminal Code of 1961 (720 ILCS 5/5-2(c) (West 2012)), which governs accountability, provides that "[a] person is legally accountable for the conduct of another when: *** either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense." This provision reflects the common-design rule (*People v. Fernandez*, 2014 IL 115527, ¶ 13), under which, when two or more people engage in a common criminal design or agreement, any act in furtherance committed by one party is considered the act of all parties, who are equally responsible for the consequences of that act (*People v. Walls*, 2022 IL App (1st) 200167, ¶ 20 (citing *People v.*

*Perez*, 189 Ill. 2d 254, 267 (2000)). The court's comments in the instant case must be viewed through that framework.

¶ 43    Notwithstanding defendant's assertion that he was merely "present for the murder" and his emphasis on specific acts that he maintains were neither attributed to him in the factual basis nor shown by the record to have been personally committed by him, defendant pleaded guilty to first-degree murder under an accountability theory arising from a jointly undertaken plan to rob Nutter. By doing so, defendant necessarily admitted his participation in the criminal enterprise that culminated in Nutter's murder and accepted legal responsibility for Nutter's death, regardless of whether he was the shooter. See *People v. Cerda*, 2021 IL App (1st) 171433, ¶ 93 (observing that a shot fired by one defendant " 'was a shot fired by all and all of them must answer for the result' " (quoting *People v. Tarver*, 381 Ill. 411, 415-16 (1942)). As the trial court commented at the sentencing hearing, defendant "came into this courtroom today as an admitted murderer."

¶ 44    Here, the challenged findings primarily arose during the circuit court's discussion of the circumstances of the offense, which is a factor it must consider in sentencing a juvenile offender. 730 ILCS 5/5-4.5-105(a)(5) (West 2024). Against this backdrop, the court's references to certain acts taken by the group of which defendant was a part—including obtaining the firearm, contacting Nutter to arrange the meeting, bringing the gun to the meeting location, placing Nutter's body in the trunk and later abandoning it, and thereafter stealing Nutter's wallet—reflect that the court was discussing the circumstances of the offense as a whole and defendant's participation in the offense. Indeed, the court repeatedly emphasized that defendant was "part of" the group when it commented on various stages of the offense, in that he was "part of the planning," "part of stealing the gun," and "part of it," when describing the offense as a whole. Thus, when the court stated that "you put Colin Nutter's body in the trunk" and "dumped his body," among other remarks, it plainly was not

making discrete factual findings that defendant personally committed every act associated with the offense. Rather, the court's comments, including its repeated use of the word "you," are more reasonably understood as references to the collective conduct of the group and as attributing to defendant actions for which he was legally accountable by virtue of his participation in the underlying criminal agreement.

¶ 45　This record confirms this understanding. At the time of the sentencing hearing, Judge Rossetti had presided over all three codefendants' cases for more than a decade, including Vatamaniuc's bench trial, during which extensive testimony concerning the specific circumstances of the offense was presented. During the Rule 402 conference in defendant's case, the court expressly stated its understanding that defendant was "always in the front seat," and that it was "Schenk and Vatamaniuc who actually got out of the car to get the wallet, not [defendant]." Moreover, the factual basis agreed to by the parties provided that "Schenk and Vatamaniuc *** put Colin's body in the trunk," and Sergeant Levy similarly testified at the sentencing hearing that "Mr. Schenk and Mr. Vatamaniuc removed Mr. Nutter's body from behind the wheel and put it in the trunk of the car." Given these clear acknowledgments, the court's subsequent references to putting Nutter's body in the trunk or dumping the body, among other specific acts, cannot be reasonably interpreted as reflecting a mistaken belief that defendant personally carried out those discrete acts. Defendant's argument therefore fails.

¶ 46　　　　　　　　　　2. *Presentence Investigation Report*

¶ 47　In a related argument, defendant contends that he was denied a fair sentencing hearing because the PSI was not prepared by a neutral party. Specifically, he maintains that the probation officer who prepared the report devoted a substantial portion of it to "prov[ing] that [defendant] was a liar and a difficult inmate for corrections officers at the Lake County Jail," and she interjected

her own feelings about defendant, the instant offense, and the prolonged length of time the case had pended. Defendant draws our attention to several comments in the report, including that he "has not been a consistent historian," the probation officer's notation that defendant's mother "did not confirm" certain information he provided, and the probation officer's assertion that defendant made "numerous attempts to manipulate the system" and was a challenging and incorrigible inmate. He quotes at length from the "Conclusion/Recommendation" portion of the PSI, which, in his view, demonstrates that the probation officer functioned not as a neutral investigator but as an extension of the prosecution. He highlights the following passage:

"Mr. Coffee has serious mental health issues that have been left untreated because his criminal thinking and antisocial behavior have overshadowed his need for help. During the ten years since the instant offense, the defendant has made numerous attempts to manipulate the system. He would, at varying times, become uncommunicative, exhibit mental health symptoms, sometimes physical symptoms, inflict superficial self-harm, and threaten suicide or homicide to get what he wanted. These behaviors must be taken at face value, even in the wake of the defendant's documented and admitted malingering. He has been hospitalized locally at least twice and committed to state hospitalization at least four times. He has been sent to the Administrative Segregation Unit or placed on suicide watch in the observational booking area of the jail dozens of times. He is now considered an incorrigible inmate. Judging by numerous reports, Mr. Coffee's actions have been a continual source of exasperation, frustration and weariness amongst corrections staff. Furthermore, his actions have caused prolonged agony to Colin Nutter's family which has not diminished over time. It has been ten years since Mr. Coffee's participation in the

instant offense, and he continues to demonstrate a lack of empathy for others in the years since."

Defendant contends that, rather than disregarding and striking the improper and inflammatory statements contained in the PSI, the circuit court echoed those statements when imposing the 40-year sentence.

¶ 48     A presentence investigation report is a mandatory legislative requirement in felony cases (*People v. Youngbey*, 82 Ill. 2d 556, 561 (1980)), which the sentencing court is obligated to consider (730 ILCS 5/5-3-1 (West 2024)).  "[T]he purpose of the requirement of a presentence investigation report is to insure [*sic*] that the trial judge will have all necessary information concerning the defendant before sentence is imposed, including the defendant's criminal history." *Youngbey*, 82 Ill. 2d at 564.  The presentence investigation must be conducted by a neutral party. *People v. Blanck*, 263 Ill. App. 3d 224, 237 (1994).

¶ 49     Defendant has forfeited review of this claim because he neither objected to any purported bias or unfair commentary in the report at the sentencing hearing nor raised the issue in his written postjudgment motion to reconsider sentence.  See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (to preserve an issue for appellate review, a defendant must object to the issue at trial or sentencing and include it in a written posttrial motion); *In re Angelique E.*, 389 Ill. App. 3d 430, 432 (2009) ("any sentencing issues not raised in a motion to reconsider the sentence are forfeited").  At the very outset of the sentencing hearing, the court confirmed with defense counsel that he had reviewed the PSI with defendant and inquired whether counsel sought any additions or corrections. In response, counsel requested several revisions, including striking the assertion that defendant was acquainted with Nutter before the murder, correcting a reference to defendant's "daughter" when the reference should have been to his "sister," and removing a victim impact statement

prepared by Nutter's parents for inclusion in Vatamaniuc's PSI. The court granted these requested corrections and revisions, including striking the victim impact statement from the PSI. Defendant raised no objection to any purported bias or unfair commentary in the report, notwithstanding that parties are obligated to alert the sentencing court to any alleged deficiencies or inaccuracies in the PSI. *People v. Meeks*, 81 Ill. 2d 524, 533 (1980). Because the defendant did not raise this issue in the circuit court, he has forfeited appellate review of this contention.

¶ 50    Defendant alternatively requests that, to the extent he failed to preserve this issue or any other issue, that we review this claim under either first-prong plain error or as ineffective assistance of counsel, both of which provide narrow exceptions to the forfeiture rule. To obtain relief under the first prong of the plain-error doctrine, a defendant must first show that a clear or obvious error occurred and that the evidence at the sentencing hearing was closely balanced. *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). Conversely, claims of ineffective assistance of counsel are analyzed under the familiar two-prong test outlined in *Strickland v. Washington*, 466 U.S. 668, 694 (1984). There, the defendant must show that (1) counsel's performance was deficient in that it fell below an objective standard of reasonableness, and (2) the deficient performance prejudiced defendant, meaning that, but for counsel's deficient performance, the result of the proceeding would have been different. *People v. Houston*, 226 Ill. 2d 135, 144 (2007). The defendant bears the burden of establishing either plain error (*People v. Quezada*, 2024 IL 128805, ¶ 51) or ineffective assistance of counsel (*People v. Yankaway*, 2025 IL 130207, ¶ 61).

¶ 51    When addressing a claim of plain error and an alternative claim of ineffective assistance of counsel, appellate courts first consider whether the defendant has established a clear or obvious error. "Absent a clear or obvious error ***, neither the doctrine of plain error nor a theory of ineffective assistance affords any relief from the forfeiture." *People v. Jones*, 2020 IL App (4th)

190909, ¶ 179.  See also *People v. Hensley*, 2014 IL App (1st) 120802, ¶ 47 (observing that "[t]he failure of a defendant to show that error occurred at all defeats both an ineffective assistance claim and a claim of error under either prong of the plain error doctrine").

¶ 52    We determine that no error occurred in the circuit court's consideration of the PSI. Although a presentence investigation must be conducted by a neutral party (*Blanck*, 263 Ill. App. 3d at 237), the record does not support defendant's claim that the probation officer abandoned that role, demonstrated animus, or somehow acted as an extension of the prosecution.  Rather, the remarks in the PSI that defendant challenges are grounded in defendant's documented conduct during his more than 10-year history while housed in the Lake County jail and while receiving mental health treatment.

¶ 53    Defendant's records, which include multiple fitness evaluation reports and numerous mental health evaluations, reflect the opinion of mental health professionals that, although he suffered from mental health challenges, he often feigned symptoms to get transported from the jail to a hospital setting, engaged in "self-inflicted superficial self-harm," had refused to eat or drink in an attempt "to be manipulative," repeatedly refused prescribed medication, and espoused suicidal and homicidal ideation to get attention.  Significantly, every observation defendant points to as evidence of bias was not the probation officer's own characterizations but was derived from records and other sources that she reviewed to prepare the PSI.

¶ 54    For example, a May 2016 contact form prepared by a licensed clinical social worker reported that defendant was discovered shirtless in his cell with blood on his face, torso, and arms, and he made vague statements suggesting that something was medically wrong with him.  Medical staff determined that the blood originated from a nosebleed and that defendant had a history of nosebleeds, but he disagreed and told the social worker that he wished "to go to medical" so that

he could be watched more "closely." The social worker concluded that defendant's request "indicates the *** incident was done intentionally as he does not want to be in [the administrative segregation unit] and is trying to manipulate getting placement in medical." The report further noted that defendant had a "significant [history] of manipulation," had previously been "denied placement in medical," and may "act out" if he did not get his way.

¶ 55 Similarly, a July 2018 admission assessment prepared by a clinical psychologist at the Elgin Mental Health Center stated that defendant "is an unreliable historian, as evidenced by multiple responses that were inconsistent with information from available records," and that defendant was "feigning *** legal knowledge deficits." The assessment recounted information obtained from various collateral sources, including a June 2018 fitness evaluation report prepared by Dr. Shinhoster. Because defendant was unable or unwilling to participate in the evaluation, Dr. Shinhoster relied on information supplied by jail personnel and other institutional sources. The assessment recounted that, per the fitness evaluation, defendant was "not medication compliant in the jail," had a "tendency to engage in 'self-inflicted superficial self-harm,'" and was described as "noncooperative, attention-seeking, and manipulative." The evaluation also noted Dr. Shinhoster's opinion that, although defendant suffered from mental illness, "it appears he exaggerated the extent of his psychiatric symptoms." An August 2018 addendum to the assessment ultimately concluded that defendant was "volitionally feigning, and to a grossly exaggerated degree, memory impairments, a lack of legal knowledge, and feigning some psychiatric symptomatology to achieve a purposeful end, the likelihood appearing to be a delay in his return to court to face his charges and/or receiving a more favorable outcome."

¶ 56 Defendant's argument also overlooks that Dr. Kostyshyna made similar observations in the mitigation report that defendant himself submitted for the court's consideration. In discussing

defendant's current mental health and behavioral functioning, Dr. Kostyshyna observed that defendant "came across as a poor historian." Elsewhere in the mitigation report, while addressing situational mitigating factors, including defendant's communication abilities, suggestibility, and memory, Dr. Kostyshyna reported that defendant's test results, records, and clinical observations indicated that he experienced "severe struggles in the area of memory" and that "[t]he combination of [defendant's] compromised memory and compromised receiving, expressing, and processing abilities makes his reports inconsistent and unreliable." Dr. Kostyshyna reiterated these observations in her summary of mitigating factors and treatment recommendations at the end of the mitigation report, describing defendant as a "poor reporter due to struggles to communicate effectively, suggestibility, and memory impairment," and that defendant "is a poor historian and has a genuinely compromised long-term memory, which is further complicated by various difficulties with learning and oppositional behaviors." Given these similar assessments from defendant's own mitigation specialist and multiple mental health professionals, the probation officer's observations that "defendant has not been a consistent historian," that certain information he provided could not be corroborated, and that he engaged in manipulative behavior cannot reasonably be construed as evidence of bias in the PSI.

¶ 57 The reference in the PSI to defendant being "considered an incorrigible inmate" likewise does not reflect personal bias on the part of the probation officer, but rather, identifies defendant's jail classification at the time the PSI was prepared. In January 2024, defendant's classification status was changed to "Level II inmate—Dangerous/Violent Person" following an altercation with another inmate and defendant's subsequent refusal to comply with correctional officers' directives. Later that same day, defendant also flooded his cell and made threats of bodily harm and death toward jail staff. Defendant's jail records also reflect dozens of disciplinary violations, including

- 25 -

numerous fights, property damage, attempting to make intoxicating substances, and attempting to obtain contraband from outside the jail using a fishing line.

¶ 58   In short, the comments that defendant challenges in the PSI reflect information contained in his institutional, medical, and mental-health records compiled over many years, as well as his own mitigation report, consisting of professional assessments that are based on defendant's history, conduct, and presentation.  Under these circumstances, the record does not support defendant's contention that the PSI was not prepared by a neutral party or that the trial court improperly relied on it in imposing sentence.  Because we find no error, there can be neither plain error nor ineffective assistance of counsel, and defendant's claims necessarily fail.  *Hensley*, 2014 IL App (1st) 120802, ¶ 47.

¶ 59                                    *3. Cumulative Error*

¶ 60   Defendant next argues that, if not individually, the cumulative effect of the above alleged errors deprived him of a fair sentencing hearing.  He maintains that his sentence reflects "the judge's own biases or personal beliefs" as to defendant's role in the offense, the age of the case at the time of sentencing, and the effect that the age of the case, which largely stemmed from the various findings of unfitness, had on the Nutter family.  Because we find no error in the circuit court's consideration of the circumstances of the offense or its consideration of the PSI, defendant's cumulative-error claim necessarily fails.  See *People v. Howell*, 358 Ill. App. 3d 512, 526 (2005) ("[i]f the alleged errors do not amount to reversible error on any individual issue, generally there is no cumulative error").

¶ 61                       B. The Circuit Court's Sentencing Determination

¶ 62   We next address defendant's alternative argument that, even if the sentencing hearing was not unfair, the circuit court abused its discretion by imposing a 40-year sentence.  Defendant

contends that his sentence is both excessive and disproportionate to his role in the offense for three reasons, namely that the circuit court (1) failed to adequately weigh his youth and developmental delays, (2) unreasonably found him incorrigible, and (3) improperly relied on the youthful parole statute, which he contends "does little to mitigate the severity of the near-life sentence imposed."

¶ 63     The Illinois Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship."   Ill. Const. 1970, art. I, § 11.   The trial court is the proper forum to determine a sentence. *People v. Latona*, 184 Ill. 2d 260, 272 (1998).   "To achieve the constitutionally mandated balance between the retributive and rehabilitative purposes of punishment, the trial court must carefully consider all aggravating and mitigating factors, including 'the defendant's age, demeanor, habits, mentality, credibility, criminal history, general moral character, social environment, and education, as well as the nature and circumstances of the crime and of defendant's conduct in the commission of it.' "  *People v. Boots*, 2022 IL App (2d) 200640, ¶ 41 (quoting *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002)).   It must balance the circumstances of the case, including the seriousness of the offense, the need to protect the public, and the need for punishment and deterrence. *People v. Klein*, 2022 IL App (4th) 200599, ¶ 34.   The paramount factor in reaching a sentencing determination is the seriousness of the offense (*People v. Kelly*, 2015 IL App (1st) 132782, ¶ 94), and the sentencing court need not give greater weight to mitigating factors (*People v. Harmon*, 2015 IL App (1st) 122345, ¶ 123).   Moreover, the sentencing court is not required to expressly articulate its reasoning for the sentence and, absent an affirmative showing in the record to the contrary, the reviewing court presumes that the trial court considered all mitigating factors in the record. *People v. Contursi*, 2019 IL App (1st) 162894, ¶ 24.

¶ 64    Additionally, when sentencing an offender who was under 18 years of age at the time of the offense, a sentencing court must consider the mitigating factors listed in section 5-4.5-105 of the Code, which codify the principles announced in *Miller v. Alabama*, 567 U.S. 460 (2012), in determining the appropriate sentence.

¶ 65    The circuit court has broad discretion in imposing a sentence, and its sentencing decision is entitled to great deference. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). This is so because the trial judge is in a superior position to observe the "defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age," as opposed to the reviewing court, which must rely on a cold record. *People v. Etherton*, 2017 IL App (5th) 140427, ¶ 15. See also *People v. Risley*, 359 Ill. App. 3d 918, 920 (2005) ("[t]he trial court is in the best position to fashion a sentence that strikes an appropriate balance between the goals of protecting society and rehabilitating the defendant"). We will not substitute our judgment for that of the trial court merely because we may have weighed the pertinent factors differently. *People v. Stacey*, 193 Ill. 2d 203, 209-10 (2000). A reviewing court will not disturb a trial court's sentencing decision that is within the statutory limits absent an abuse of discretion, meaning "the sentence is 'greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense.' " *Alexander*, 239 Ill. 2d at 212 (quoting *Stacey*, 193 Ill. 2d at 210). If a sentence falls within the statutory range, it is presumed proper. *People v. Campos*, 2024 IL App (2d) 230056, ¶ 53.

¶ 66    As we explain below, the circuit court did not abuse its discretion in sentencing defendant to a 40-year-term of imprisonment. At the outset, we observe that defendant pleaded guilty to first-degree murder, which has a sentencing range of 20 to 60 years' imprisonment. 730 ILCS 5/5-4.5-20(a) (West 2024). Defendant's sentence falls within that sentencing range and therefore is

presumed proper.  See *Stacey*, 193 Ill. 2d at 210; *Campos*, 2024 IL App (2d) 230056, ¶ 53; *People v. Boots*, 2022 IL App (2d) 200640, ¶ 44.

¶ 67                    1. *Defendant's Youth and Developmental Delays*

¶ 68    Defendant's assertion that the circuit court failed to meaningfully consider his inherent immaturity and youthfulness at the time of the offense is belied by the record.  Defendant's argument in this respect focuses primarily on the court's consideration of the first three mitigating factors applicable to youthful offenders under section 5-4.5-105(a) of the Code, namely his age, impetuosity, and level of maturity at the time of the offense; whether he was subjected to outside pressure; and his family, home environment, and educational and social background.  See 730 ILCS 5/5-4.5-105(a)(1)-(3) (West 2024).

¶ 69    In announcing its sentencing decision, the court expressly stated that it had considered the facts of the case, the statutory factors in aggravation and mitigation, the mitigating factors applicable to juvenile offenders under section 5-4.5-105(a) of the Code (730 ILCS 5/5-4.5-105(a) (West 2024)), the PSI (which included defendant's school, medical, mental health, and fitness evaluation records), the victim impact statements, defendant's mitigation report, the social worker's report, and the parties' arguments and sentencing recommendations.  It also expressly recognized the need to balance the retributive and rehabilitative purposes of sentencing and acknowledged that, under *Miller*, children are constitutionally different from adults for sentencing purposes because they are less deserving of the most severe punishments because of their diminished culpability and greater potential for reform.  See *Montgomery v. Louisiana*, 577 U.S. 190, 206 (2016); *Miller*, 567 U.S. at 476.

¶ 70    Far from overlooking defendant's youth, the circuit court repeatedly emphasized that defendant was just 17 years old at the time of the offense, and it methodically addressed each of

the mitigating *Miller* factors, as codified by the legislature in section 5-4.5-105(a) of the Code, first reading the factors into the record nearly verbatim, and then evaluating them individually and in the order in which they appear in the Code. The court began by analyzing defendant's age, impetuosity, and level of maturity at the time of the offenses, acknowledging that he was 17 years old at the time of the offense and had significant developmental delays. It noted that defendant had an individualized education plan (IEP) beginning at age six, was academically well behind his peers, and had been diagnosed with schizophrenia, bipolar disorder, and attention-deficit/hyperactivity disorder with cognitive and achievement delays. It also recognized that defendant "struggled neurodevelopmentally in the area of processing, learning, language, receptive and expressive skills, and long-term memory." Regarding defendant's ability to consider risks and consequences of behavior, the court found that, despite defendant's cognitive delays, he understood that behavior has consequences, noting that just one month before the instant offense, defendant pleaded guilty to battery in an unrelated offense which, in the court's view, demonstrated that he understood "that a crime has consequences." The court also noted that defendant's experience with school discipline and his loss of basketball privileges due to his poor grades further reinforced defendant's understanding that behavior has consequences.

¶ 71    The circuit court next considered whether defendant was subjected to outside pressure, including peer pressure or other negative influences, in committing the instant offense. While it acknowledged that two codefendants were also present for the murder, the court concluded that their presence "doesn't equal pressure to do what [defendant] did." It reiterated that the gun used in the offense had been stolen from a friend's house, that defendant fired it three times into a friend's ceiling before the murder, and that he possessed the gun at Hahn's house before the murder, passing it around and repeatedly loading and unloading it. Though not articulated by the court in

announcing its ruling, the unrebutted evidence also demonstrated that defendant possessed the weapon the day before the murder, showed it off to others and told them that he had "heat." The court further noted that, after Nutter was killed, defendant "didn't walk away," but instead drove around with the victim's body in the trunk, broke into Nutter's home and stole his marijuana, prescribed pet medication, and the family's vehicle. The court reasonably concluded that this conduct was indicative not of "someone who was pressured," but as someone acting as a voluntary participant in the offense. In this regard, defendant's reliance on *People v. McKinley*, 2020 IL App (1st) 191907, is misplaced. There, the reviewing court held that the trial court improperly treated peer pressure as an aggravating, rather than a mitigating, factor where it concluded that the defendant was "part of a pack" that had derived "strength from each other when they act in that fashion." *Id*. ¶¶ 87-88. The *McKinley* court found that the erroneous categorization of peer pressure as an aggravating factor was "especially egregious" because the defendant in that case was instructed by a peer to shoot the victim. *Id*. ¶ 88. Here, by contrast, the circuit court did not treat peer pressure as an aggravating factor, but rather, considered whether defendant acted under peer pressure in mitigation and reasonably concluded that the evidence did not support such a finding, observing that defendant was "not someone who was pressured." Moreover, the unrebutted evidence showed that defendant turned up the volume on the radio immediately before the shooting, which is an act the court could reasonably view as facilitating the offense by attempting to mask the sound of the gunshot and not reflective of an unwilling participant succumbing to peer pressure.

¶ 72 The circuit court also gave due consideration to defendant's family, home environment, educational, and social background, which is the third mitigating factor sentencing courts are to consider in sentencing a youthful offender. 730 ILCS 5/5-4.5-105(a)(3) (West 2024). The court

stated that the PSI, mitigation report, report from the social worker, and defendant's mental health records reflected that defendant's home life was "wonderful" and that he had "a loving family [and] strong family support," and that his high school records described him as pleasant, engaging, and someone who had many friends. The court commented on the presence of defendant's family at the sentencing hearing. Defendant nevertheless complains that the court also "address[ed] all of [his] transgressions" at school, including tardiness, absences, failing to complete homework, being disruptive, and bullying, but we find no error. This argument is unpersuasive because the court was not required to disregard unfavorable aspects of defendant's educational and social background in assessing this mitigating factor. Rather, the court's comments reflect that it considered defendant's entire background in analyzing this factor, which was appropriate.

¶ 73                    2. *Defendant's Rehabilitative Potential*

¶ 74    Defendant also contends that the trial court's characterization of him as "incorrigible" was unreasonable in light of evidence that he had rehabilitative potential. Defendant concedes that a sentencing court is no longer constitutionally required to find a juvenile defendant permanently incorrigible before imposing a discretionary life sentence or *de facto* life sentence (see *People v. Wilson*, 2023 IL 127666, ¶ 42 (overruling *People v. Holman*, 2017 IL 120655, ¶ 46, to the extent it held that a juvenile defendant may be sentenced to life imprisonment without parole only if the trial court determines the defendant is permanently incorrigible)). His argument, instead, appears to be that the court's characterization of him as "incorrigible" reflects an unreasonable assessment of the fourth juvenile sentencing factor in section 5-4.5-105(a) of the Code, namely his "potential for rehabilitation or evidence of rehabilitation, or both." Defendant also contends that the court unreasonably discounted evidence that his post-arrest misconduct stemmed, at least in part, from sexual abuse he suffered at the hands of a correctional officer at the Lake County jail.

¶ 75 We are unpersuaded. It is true that, in announcing its sentencing decision, the circuit court acknowledged several indicators bearing on defendant's rehabilitative potential, including his guilty plea, his apology to the Nutter family and the court's belief that he was "truly sorry," the findings and recommendations contained in the mitigation report, and the court's observations that defendant "appear[ed] empathetic," had learned coping skills, and had a positive attitude toward authority. However, defendant reads the court's remarks far too generously to his position. Contrary to defendant's argument, the court did not expressly find that he possessed rehabilitative potential. Rather, it repeatedly stated that it had "take[n] into account" this evidence in determining an appropriate sentence, describing defendant's guilty plea as "the first step towards rehabilitation" and his expression of remorse as a "step towards rehabilitation." The court's consideration of evidence bearing on his rehabilitative potential is unsurprising, as such consideration is required by section 5-4.5-105(a)(4) of the Code. Moreover, the court expressly recognized that rehabilitation is "the primary purpose of our sentencing statute." See *People v. Himber*, 2020 IL App (1st) 162182, ¶ 59 (observing that a proper sentence must balance the seriousness of the offense and the defendant's potential for rehabilitation), and it repeated those remarks elsewhere in its sentencing ruling.

¶ 76 Here, after weighing this evidence with defendant's decade-long history of institutional misconduct, the court ultimately characterized defendant as "probably the most incorrigible inmate in the Lake County jail." It noted defendant's repeated instances of feigning symptoms to avoid court proceedings, his refusal to take medication and participate in restoration classes despite multiple findings of unfitness, his involvement in numerous fights and other disruptive behavior, his destruction of property, his attempt to manufacture intoxicants in the jail, and his use of a fishing line to obtain contraband from outside the jail. The court also considered defendant's

specific conduct surrounding the offense, which it described as a cold-blooded and senseless execution, concluding that defendant "had a complete disregard for Colin's life." Contrary to defendant's assertion, the record demonstrates that the court gave due consideration to defendant's sexual exploitation by a corrections officer, expressly recognizing it during its sentencing remarks. While defendant's exploitation was undoubtedly traumatic, the court was not required to accept it as an explanation for all of defendant's institutional misconduct, particularly where much of that misconduct predated the abuse.

¶ 77    Even if the circuit court had expressly found defendant had rehabilitative potential, his argument would still fail. To the extent defendant contends that a finding of rehabilitative potential somehow precludes a sentencing court from imposing a *de facto* life sentence on a juvenile offender, this court has already rejected that premise. See *People v. Reyes*, 2025 IL App (2d) 210423-B, ¶ 48 (holding that section 5-4.5-105 of the Code does not "categorically bar a court from sentencing a juvenile to a *de facto* life sentence despite finding that the juvenile has some rehabilitative potential," but rather, "a juvenile's rehabilitative potential is one factor—albeit an important one—for the court to consider"). Thus, a sentencing court does not abuse its discretion simply because it recognizes evidence of rehabilitative potential but ultimately concludes that the seriousness of the offense and other sentencing considerations warrant a severe sentence. Defendant's reliance on *People v. Murphy*, 2019 IL App (4th) 170646, is therefore misplaced.

¶ 78    At its core, defendant's argument asks us to reweigh this sentencing factor, which we may not do. *People v. Moreira*, 378 Ill. App. 3d 120, 131 (2007). Relevant here, a sentencing court is "not required to give greater weight to mitigating factors than to the seriousness of the offense." *Harmon*, 2015 IL App (1st) 122345, ¶ 123. Based on the evidence presented at the hearing, the court concluded that defendant remained defiant and disruptive, demonstrated a disregard for

human life, and bore what it characterized as the "mark of a dangerous, incorrigible and irreparably corrupt person." We cannot say that this assessment, or the resulting sentence, constituted an abuse of discretion.

¶ 79                                     3. *The Youthful Parole Statute*

¶ 80    In a related argument, defendant contends that the circuit court erred in relying on the availability of youthful parole to mitigate the severity of his 40-year sentence. He argues that, although he will be eligible for parole pursuant to section 5-4.5-115 of the Code after serving 20 years, the statute "fails to provide [him] the viable opportunity for release *** that was contemplated by the court." According to defendant, the statute affords him only "a slim chance of release prior to *** serving the entirety of his 40-year sentence." He maintains that the court erred by relying on what it characterized as a statutory change that "substantially changes the law" and erroneously concluded that no sentence it could impose would be "tantamount to a life sentence," and it minimized the significance of the juvenile sentencing factors set forth in section 5-4.5-105(a) of the Code as a result.

¶ 81    Defendant's argument is unavailing because it rests on the erroneous premise that the circuit court misunderstood the legal effect of section 5-4.5-115. The court's statements regarding that section of the Code, however, accurately reflected what our supreme court subsequently confirmed in *People v. Spencer*, 2025 IL 130015. There, the *Spencer* court held that when a youthful offender is eligible for parole review under section 5-4.5-115, the sentence, even if exceeding 40 years, does not constitute a *de facto* life sentence. *Id.* ¶ 40. In so ruling, the court reasoned that, because the defendant, who in that case had been sentenced to an aggregate term of 100 years' imprisonment, would be eligible for parole review after serving 20 years, he would have "a meaningful opportunity to obtain release before he spends 40 years in prison." *Id.* The *Spencer*

court also expressly overruled *People v. Gates*, 2023 IL App (1st) 211422, ¶¶ 38-49, and *People v. Carrasquillo*, 2023 IL App (1st) 211241, ¶ 51, to the extent that those decisions could "be interpreted to hold that sentences over 40 years are *de facto* life sentences despite the defendant's eligibility for parole." *Spencer*, 2025 IL 130015, ¶ 40. Therefore, contrary to defendant's assertion, the court's observation in the instant matter that the enactment of the youth parole statute "substantially change[d] the law" and that his sentence would not be tantamount to a life sentence reflected an accurate understanding of the legal effect of section 5-4.5-115.

¶ 82    Defendant's contention concerning the adequacy of the parole review process, including his observation that the statute will afford him only two opportunities for parole review (see 730 ILCS 5/5-4.5-115(b), (m) (West 2024)) and provides no guarantee of early release, are foreclosed by *Spencer*. Defendant's argument amounts to a disagreement with the legislature's policy judgment concerning the availability and operation of youthful parole. That policy determination rests with the General Assembly, not the courts. See *People ex rel. Kubala v. Kinney*, 25 Ill. 2d 491, 494 (1962) (observing that parole is "an act of clemency and grace" that the legislature may grant, modify, or withdraw).

¶ 83    Defendant's related argument that the circuit court's consideration of section 5-4.5-115 of the Code "directly influenced how the court evaluated and minimized the codified *Miller* juvenile sentencing considerations" is unsupported by the record. In announcing its sentencing decision, the court began by reciting, nearly verbatim, the statutory mitigating factors applicable to youthful offenders under section 5-4.5-105(a) of the Code. It then discussed the applicable controlling case law outlining those factors, including the principle that, under *Miller*, children are constitutionally different from adults for sentencing purposes because they are less deserving of the most severe punishments due to their diminished culpability and greater potential for reform. See *Montgomery*,

577 U.S. at 206; *Miller*, 567 U.S. at 476. The court further recognized that it was "mandated to follow a process, considering [defendant's] youth and [attendant] characteristics," before discussing the significance of the then-newly enacted section 5-4.5-115, which governs parole review of offenders who were under the age of 21 at the time of their offense. The sentencing court then proceeded to carefully analyze each of the mitigating sentencing factors set forth in section 5-4.5-105(a). Other than emphasizing comments that we have already concluded accurately reflected the legal effect of Illinois's youth parole statute, defendant identifies nothing in the record demonstrating that the court's consideration of section 5-4.5-115 caused it to downplay its consideration of the *Miller* factors as codified in section 5-4.5-105(a). Nothing identified in the record suggests that the court believed defendant's eligibility for parole would guarantee early release. To the contrary, the court repeatedly observed only that defendant would "be eligible for parole after 20 years," not that he would necessarily be released at that time. Defendant's argument therefore fails.

¶ 84                                         C. Rule 604(d)

¶ 85     Defendant's final argument on appeal is that, although his counsel filed a facially compliant Rule 604(d) certificate, counsel nevertheless failed to strictly comply with the rule by failing to attach any affidavits in support of defendant's motion to withdraw his guilty plea. According to defendant, his motion relied on facts outside the record, namely his assertions that he (1) "did not know what was going on" when he entered the plea, (2) believed that the circuit court would "offer" him a sentence, and (3) believed that he could either accept or reject the "offer" and, if he rejected it, his case would proceed to trial. Defendant therefore contends that counsel's failure to submit affidavits or any other evidence in support of his claim demonstrates that counsel did not make the amendments necessary for the adequate presentation of any defects in the plea

proceedings, notwithstanding his certification to the contrary under Rule 604(d). The State responds that no affidavit was required because, at root, defendant's motion challenged the adequacy of the Rule 402 plea colloquy and therefore could be resolved by reviewing the plea transcript, which the State maintains conclusively refutes defendant's assertion that he misunderstood the nature of his plea. We agree with the State.

¶ 86    Rule 604(d) governs the procedure for perfecting an appeal from judgments entered upon a plea of guilty. It provides that, before a defendant may appeal from a judgment entered upon a guilty plea, he or she must file a written motion in the trial court within 30 days of the date on which sentence is imposed. *Id.* If the defendant wishes to challenge only the plea, he must file a motion to withdraw his guilty plea and vacate the judgment. If the defendant wishes to challenge only the sentence, he must file a motion to reconsider sentence. *Id.* Additionally, the motion must be in writing and "state the grounds" for the motion. As pertinent to defendant's argument, when the motion is "based on facts that do not appear of record it shall be supported by affidavit unless the defendant is filing the motion *pro se* from a correctional institution." *Id.*

¶ 87    Rule 604(d) also imposes certain specific duties on counsel. A defendant's attorney must file in the trial court a certificate stating that the attorney has (1) consulted with the defendant, either by phone, mail, electronic means or in person to ascertain defendant's contentions of error in the sentence and the entry of the plea of guilty, (2) examined the trial court file and both the reports of proceedings of the plea of guilty and the sentencing hearing, and (3) made any amendments to the motion necessary for an adequate presentation of any defects in those proceedings. *Id.* The certificate must strictly comply with Rule 604(d) and, if it does not, the reviewing court is obligated to remand the matter to the trial court " 'for the filing of a new Rule 604(d) certificate, for the filing of a new motion to withdraw guilty plea or to reconsider sentence,

and for a new hearing on the motion.' " *People v. Suaste-Gonzalez*, 2023 IL App (2d) 220323, ¶ 24 (quoting *People v. Gorss*, 2022 IL 126464, ¶ 31). Moreover, notwithstanding the filing of a facially valid certificate, a reviewing court may examine the record in evaluating whether counsel fulfilled his obligations under the rule, and the court must remand the matter if the record refutes the certificate. *People v. Bridges*, 2017 IL App (2d) 150718, ¶ 12. We review *de novo* the question of whether counsel complied with Rule 604(d). *Suaste-Gonzalez*, 2023 IL App (2d) 220323, ¶ 24.

¶ 88   Here, defendant's motion to withdraw his guilty plea was expressly premised on the assertion that he "did not enter into the plea knowingly, voluntarily[,] or intelligently." In support of that claim, defendant alleged that, at the time he entered the plea, he "did not know what was going on," believed that the circuit court would "offer" him a sentence that he could either accept or reject, and believed that, if he rejected the "offer," his case would proceed to trial. Notwithstanding defendant's characterization of the issue as one requiring evidence outside the record, his claim fundamentally challenges whether the Rule 402 plea colloquy adequately established that he understood the nature and consequences of his plea. That question is resolved by examining the plea transcript, not by considering evidence outside the record.

¶ 89   Illinois Supreme Court Rule 402 governs guilty pleas and stipulations sufficient to convict. Before accepting a guilty plea, the circuit court must personally admonish the defendant in open court and determine that the defendant understands (1) the nature of the charge, (2) the minimum and maximum sentence prescribed by law, (3) that he or she has the right to plead not guilty, and (4) that by pleading guilty there will not be a trial of any kind, such that the defendant "waives the right to a trial by jury and the right to be confronted with the witnesses against him or her." Ill. S. Ct. R. 402(a) (eff. July 1, 2012). The rule prohibits the court from accepting a guilty plea without first determining whether the defendant has entered it voluntarily. Ill. S. Ct. R. 402(b) (eff. July 1,

2012).  As part of that colloquy, the court must personally question the defendant in open court to confirm the terms of any plea agreement, or if no agreement exists, confirm that there is no agreement, and to determine whether any force, threats, or promises, were used to induce the plea. *Id*.  The purpose of Rule 402 admonitions is to ensure a defendant's guilty plea is not accepted unless the record affirmatively demonstrates that the plea was intelligent and voluntary.  *People v. Horton*, 250 Ill. App. 3d 944, 951 (1993).

¶ 90    Here, the transcript of the plea proceedings establishes that the circuit court complied with Rule 402 and demonstrates that defendant understood the nature and consequences of his guilty plea, as well as that he knowingly and voluntarily entered the plea.  Rather than paraphrase the plea proceedings, we reproduce the relevant portion of the plea colloquy in full because it conclusively refutes defendant's assertion that he believed the court would "offer" him a sentence that he was free to accept or reject and that, if he rejected the "offer," the case would proceed to trial:

> "MR. PAVLETIC [(ASSISTANT STATE'S ATTORNEY)]: I would indicate for the Court that we do have a plea to present to the Court.
>
> THE COURT: Go ahead, please.
>
> MR. PAVLETIC:  Judge, there is—in the indictment before you in 13 CF 1610 the defendant would plead guilty to Count 3.  That is the count of first-degree murder.  At the time of sentencing, it's the State's intention to nolle all the remaining counts.  I would also indicate that the State would be nolle'ing the offense in 20 CF 1530 as well.  This is an open plea with the understanding that the Court on two 402 conferences that we had had outlined the parameters that the Court would be entertaining at sentencing.  Is that accurate, Counsel?

MR. GRANT [(ASSISTANT PUBLIC DEFENDER)]: Yes.

THE COURT: So, Mr. Coffee, have you gone over all of this with Mr. Grant?

THE DEFENDANT: Yes, ma'am.

THE COURT: Do you understand that there is absolutely no agreement as to what your sentence will be? Do you understand that?

THE DEFENDANT: Yes, ma'am.

THE COURT: And you went over that with Mr. Grant?

THE DEFENDANT: Yes, ma'am.

THE COURT: Now, on the first-degree murder the possible penalties can be between 20 and 60 years in the Department of Corrections, and it would be followed by three years of mandatory supervised release[,] and this is served at 100 percent. Do you understand that?

THE DEFENDANT: Yes, ma'am.

THE COURT: Now, I know we went over the 402 conferences that we had; and the Court indicated that if there was a plea of guilty, the sentence could be somewhere between 35 and 42 years in the Department of Corrections. Is that what you've discussed with Mr. Grant?

THE DEFENDANT: Yes, ma'am.

THE COURT: Now, what will happen, sir, is after I go through everything with you is that probation will come over and interview you. They will prepare a written report called a presentencing investigation. It will be in writing. You'll have the opportunity to go over it with Mr. Grant. The State will have a copy. The Court will have a copy. We'll use that at the sentencing hearing.

Now, at the sentencing hearing, the State can present evidence. You, through Mr. Grant, can present evidence, as well as you could make a statement to the Court. All of that is to help the Court make a decision as to what the sentence will be. Do you understand that?

THE DEFENDANT: Yes, ma'am.

THE COURT: Do you have any questions about that?

THE DEFENDANT: No, ma'am.

THE COURT: Did you go over all of the facts of this case with Mr. Grant?

THE DEFENDANT: Yes, ma'am.

THE COURT: Do you have any other questions about that?

THE DEFENDANT: No, ma'am.

THE COURT: Did you discuss with Mr. Grant what would happen if there was a trial[,] such as witnesses who might be called and defenses you might have?

THE DEFENDANT: Yes, ma'am.

THE COURT: And, again, sir, any other questions?

THE DEFENDANT: No, ma'am.

THE COURT: Mr. Coffee, are you on any medication?

THE DEFENDANT: Sleeping meds. That's it.

THE COURT: That's it? Only a sleeping medication?

THE DEFENDANT: Yes, ma'am.

THE COURT: And did you take it last night?

THE DEFENDANT: Yes, ma'am.

THE COURT: And, Mr. Grant, I know you spent some time with Mr. Coffee not only this week but this morning as well. Any issues with Mr. Coffee understanding anything that was presented to him?

MR. GRANT: Your honor, as I said to Mr. Coffee just this morning, he and I have a fairly long history together. I first met him at the Chester Mental Health Center through the Department of Human Services during a period of unfitness, and there have been several periods of unfitness.

Recently, Ms. Ayala [(Assistant Public Defender)] and I have met with Mr. Coffee frequently, and we have no questions as to his fitness to proceed, his ability to understand the case as it moves forward. He has asked a number of questions of us, and we have had ample time to discuss, I would think, the matter that's before the court now.

THE COURT: And Mr. Coffee, since coming back from Chester Mental Health, has been before me a number of times and has always answered the Court's questions appropriately.

So, Mr. Coffee, do you have any questions, please stop me, and I'll give you an opportunity to go over any questions that you have with Mr. Grant. Do you understand?

THE DEFENDANT: Yes, ma'am.

THE COURT: So[,] what you are doing this morning, sir, is pleading guilty to Count 3, which is the charge of first-degree murder. That occurred on [June] 3rd of 2013. Is that correct?

THE DEFENDANT: Yes, ma'am.

THE COURT: Now, as I indicated, the possible penalties can be between 20 and 60 years in the Department of Corrections, and it's followed by 3 years of mandatory supervised release, and it's served at 100 percent. Do you understand that?

THE DEFENDANT: Yes, ma'am.

THE COURT: So[,] knowing what the possible penalties could be, do you still wish to plead guilty?

THE DEFENDANT: Yes, ma'am.

THE COURT: Now, sir, you do not have to plead guilty. You could have a trial. I know you went over this with Mr. Grant. I have to go over it again. Your trial could be either in front of a judge or in front of a jury. Do you understand that?

THE DEFENDANT: Yes, ma'am.

THE COURT: At the trial, whether it was in front of a judge or in front of a jury, the State would bring in their witnesses to testify. They have to prove that you committed this charge beyond a reasonable doubt. Do you understand that?

THE DEFENDANT: Yes, ma'am.

THE COURT: After each witness testifies, Mr. Grant would be able to question or cross-examine them. You could bring in witnesses who would testify on your behalf. And if you wanted to, you could testify at trial. Do you understand that?

THE DEFENDANT: Yes, ma'am.

THE COURT: However, sir, by pleading guilty, you give up all of those rights, and so that means there will not be a trial. Do you understand that?

THE DEFENDANT: Yes, ma'am.

THE COURT: Has anyone forced you or threatened you to plead guilty?

THE DEFENDANT: No, ma'am.

THE COURT: Have you been promised anything?

THE DEFENDANT: No, ma'am.

THE COURT: And, again, sir, this is what you wish to do this morning?

THE DEFENDANT: Yes, ma'am."

¶ 91    As the foregoing colloquy demonstrates, defendant's claimed misunderstanding of the effect of his guilty plea is affirmatively rebutted by the record.  The purpose of the admonitions required by Rule 402 is to ensure that the defendant understands the plea, the rights relinquished by pleading guilty, and the consequences of doing so.  *People v. Dougherty*, 394 Ill. App. 3d 134, 138 (2009).    Thus, "[i]f a plea of guilty is to have any binding effect or is to be given any subsequent weight," a circuit court's "extensive and exhaustive admonitions," acknowledged by the defendant, must be held to "overwhelm [a defendant's] current assertion that he entered his plea involuntarily." *People v. Robinson*, 157 Ill. App. 3d 622, 629 (1987).

¶ 92    Here, the circuit court expressly advised defendant that there was "absolutely no agreement" regarding the sentence defendant would receive upon entering a plea of guilty and explained that, following the preparation of a PSI and a sentencing hearing at which both parties could present evidence, the court would determine the appropriate sentence, which it stated, "could be somewhere between 35 and 42 years in the Illinois Department of Corrections."  Defendant repeatedly acknowledged that he understood those procedures and stated that he had no questions. The court further advised defendant that, although he had the right to a trial at which he could confront the State's witnesses and present his own testimony and witnesses, by pleading guilty he was relinquishing those rights and "there will not be a trial."  Defendant again confirmed that he understood that he was waiving his right to trial by pleading guilty.  Finally, when questioned by

the court, defendant also denied that anyone had forced or threatened him to plead guilty or made any promises to him off the record to induce his plea. "It is well settled that a defendant must alert the court at the guilty plea proceeding if his decision to plead guilty was influenced by something counsel told him that differed from the terms of the plea as described in court." *People v. Diaz*, 2021 IL App (2d) 191040, ¶ 24. As we have previously held, a "[d]efendant cannot be rewarded for ignoring the trial court's specific admonishments concerning his sentence." *People v. Ferral-Mujica*, 2017 IL App (2d) 160240, ¶ 26. That principle applies with equal force here.

¶ 93    Moreover, defendant advised the circuit court that he had taken only sleeping medication the prior night, and defense counsel reported that, despite defendant's prior periods of unfitness, counsel had no doubt that defendant was fit to proceed and capable of understanding the plea proceedings. The court likewise commented that, since defendant's final restoration to fitness, he had been before the court on several occasions and had consistently responded appropriately to the court's questions. The State also described the disposition as an "open plea" and reiterated that, during prior Rule 402 conferences, the court had "outlined the [sentencing] parameters that the Court would be entertaining at sentencing." Again, defendant confirmed that he discussed those parameters with his counsel and indicated that he had no questions.

¶ 94    Defendant's reliance on *People v. Bridges*, 2017 IL App (2d) 150718, and *People v. Winston*, 2020 IL App (2d) 180289, is misplaced. In *Bridges*, counsel amended the defendant's *pro se* motion to withdraw his guilty plea to allege, in detail, that he entered the plea under duress because of threatened violence against his mother, as well as that he did not intelligently waive his right to a trial because he was not being adequately medicated in the jail to treat his mental health conditions. *Bridges*, 2017 IL App (2d) 150718, ¶ 2. Counsel filed a Rule 604(d) certificate but did not support the motion with any affidavits. *Id.* We held that, notwithstanding counsel's facially

valid Rule 604(d) certificate, counsel failed to strictly comply with the rule because the amended motion asserted new factual allegations that were outside the record, yet counsel neglected to fulfil her obligation under the rule to support those allegations with an affidavit. *Id*. ¶ 9.

¶ 95   In *Winston*, the defendant filed a *pro se* motion to "change [guilty] plea," and defense counsel filed an amended motion alleging that the plea was involuntary because the defendant was unaware that a felony conviction would adversely affect her educational opportunities and employment prospects. *Winston*, 2020 IL App (2d) 180289, ¶ 4. At the hearing on the motion to withdraw guilty plea, the defendant also argued that the State's evidence was insufficient to prove her guilt beyond a reasonable doubt and that withdrawal of her plea was necessary to prevent a manifest injustice. *Id*. ¶ 10. In support of that claim, defense counsel sought to admit several witness statements contained in the relevant police reports. The State objected on hearsay grounds, and the trial court sustained the objection. *Id*. ¶ 9. The court asked defense counsel whether he wished to continue the hearing so that he could present the witnesses' live testimony, but counsel declined. *Id*. The court thereafter denied the motion, noting defendant's failure to present any evidence supporting her claim despite being given an opportunity to do so. *Id*. ¶ 10. Guided by our holding in *Bridges*, we held that defense counsel's facially valid Rule 604(d) certificate failed to strictly comply with the rule's requirements, as counsel "was obligated to advance that [sufficiency-of-the-evidence] argument in an amended motion supported by affidavits from the witnesses whose testimony supposedly would have exonerated defendant." *Id*. ¶ 15.

¶ 96   The instant case is readily distinguishable from *Bridges* and *Winston*. In those cases, the motions to withdraw the guilty plea rested on factual allegations that existed completely outside the record, yet defense counsel submitted neither an affidavit nor other evidence to substantiate

those allegations. Here, by contrast, defendant's assertions were fully capable of resolution by reference to the plea proceedings themselves and, in fact, are conclusively refuted by the record.

¶ 97    Even otherwise, defendant does not identify what additional evidence his counsel should have presented that was not already contained in the record. Although defendant contends his counsel should have attached an affidavit to the motion, he does not explain who should have executed it or what additional facts it would have contained. Because defendant's motion was grounded in his own purported misunderstanding of the consequences of pleading guilty, defendant himself presumably would have executed an affidavit to that effect. However, the factual allegations that such an affidavit would have contained, including defendant's erroneous belief that he could "reject" his sentence and elect to proceed to trial, were already set forth in the motion itself. Under these circumstances, requiring defense counsel to attach an affidavit merely repeating those same allegations, which are conclusively refuted by the plea transcript, would elevate form over substance while serving no meaningful purpose. See *People v. Diaz*, 2021 IL App (2d) 191040, ¶ 35.

¶ 98    Accordingly, defendant's assertion in his motion to withdraw his guilty plea that he believed the circuit court would merely "offer" him a sentence that he was free to accept or reject, and that rejection of the "offer" would result in a trial, is affirmatively and conclusively refuted by the plea proceedings as memorialized in the report of proceedings. Because defendant's claim was fully capable of resolution by reference to the existing record, Rule 604(d) did not require defense counsel to support the motion with affidavits or other evidence outside the record. Counsel therefore did not fail to make the amendments necessary for an adequate presentation of defendant's claim, but rather, strictly complied with Rule 604(d).

¶ 99                          III. CONCLUSION

¶ 100   For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 101   Affirmed.